# Exhibit 1

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
**Release No.**

**ADMINISTRATIVE PROCEEDING**
**File No.**

| | |
|---|---|
| In the Matter of<br><br>     STEVEN SEAGAL<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), against Steven Seagal ("Seagal" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Summary

1.      From approximately February 12, 2018 through March 6, 2018 (the "Relevant Period"), Seagal—a well-known Hollywood actor and producer—touted on social media a security that was being offered and sold in an initial coin offering ("ICO") without disclosing that the issuer was paying him for the promotions.  Seagal's failure to disclose this compensation violated Section 17(b) of the Securities Act, which makes it unlawful for any person to promote a security without fully disclosing the receipt and amount of such consideration.

### Respondent

2.      **Seagal**, age 67, is a U.S. national who is currently residing in Moscow, Russia.

### Facts

3.      During the Relevant Period, Seagal had approximately 107,000 Twitter followers and 6.7 million Facebook followers.

4.      During that same period, Seagal promoted on his Twitter and Facebook accounts a security being sold through an ICO, allowed his likeness to be used on the ICO issuer's official website and marketing materials, and participated in a webinar with potential investors in the ICO in exchange for payments from the ICO issuer.

5.      Specifically, Seagal promoted a securities offering conducted through an ICO by Bitcoiin2Gen ("B2G" or "the Company"), an international online company, from approximately February 12, 2018 through March 26, 2018, in which it offered and sold digital tokens ("B2G tokens") to be issued on the Ethereum blockchain.  B2G offered and sold tokens that were investment contracts and therefore securities pursuant to Section 2(a)(1) of the Securities Act.  B2G described B2G tokens as "the next generation of Bitcoin."  According to B2G's marketing materials, the Company was conducting an ICO to raise capital to build an "ecosystem" that would allow users to trade B2G tokens, provide wallet staking, and trade altcoins and fiat currencies, all "on a secure, comprehensive platform."  Participants in the ICO invested Bitcoin, U.S. Dollars, Euros, or made payments via credit card in exchange for B2G tokens.

6.      Based on B2G's marketing materials, as well as statements by B2G affiliates, B2G token purchasers had a reasonable expectation of profits from their investment in the B2G

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

enterprise. The proceeds of the B2G token offering were intended to be used by B2G to build an "ecosystem" that would create demand for B2G tokens and consequently make them more valuable. Purchasers of B2G tokens would reasonably have had the expectation that B2G and its agents would expend significant efforts to develop this ecosystem that would increase the value of their B2G tokens, resulting in investor profit. B2G's marketing materials, moreover, contained numerous direct statements that the B2G tokens would rise in value as a result of the efforts of B2G and its agents, and that, at a minimum, investors would receive a guaranteed return each month.

7.      In addition, B2G's marketing materials highlighted that the Company and its agents would ensure a secondary trading market for B2G tokens after the ICO, noting the ability for investors to liquidate and trade B2G tokens on digital-asset platforms following the token sale, including its own secondary trading platform. B2G's marketing materials also emphasized the purported expertise of B2G's management.

8.      Pursuant to a contract between Seagal and the entity controlling B2G ("the Endorsement Agreement"), Seagal was promised $250,000 in cash and $750,000 worth of B2G tokens in exchange for his promotion of B2G.

9.      Consistent with the Endorsement Agreement, on February 12, 2018, B2G announced, via a press release, that Seagal would endorse its ICO. The press release quoted Seagal as saying: "I endorse this opportunity wholeheartedly . . . I am excited about the management, and especially about the secure blockchain, underlying mining technology, and safeguards." Seagal's quote in the press release did not disclose that he was being paid for the promotion.

10.     Shortly thereafter, Seagal began promoting B2G's ICO on social media by posting or authorizing his agents to post at least nine touts, including, among others, the following:

a.      On February 19, 2018, Seagal's Facebook account posted a link to the press release on B2G's newsroom page titled "Zen Master Steven Seagal Has Become the Brand Ambassador of Bitcoiin2Gen." The post contained the caption: "From Team Seagal . . . Steven has just become the worldwide ambassador for the Bitcoiin 2nd Generation crypto currency." The post also contained a link to participate in the ICO and a promotional code.

b.      On February 20, 2018, Seagal's Twitter account posted a link to the same press release that promoted the ICO and included his endorsement. This post was "pinned" to Seagal's Twitter account, thus displaying before all of Seagal's other posts on his Twitter page.

c.      On February 28, 2018, Seagal's Twitter account posted a picture of Seagal with the caption: "Congratulations @bitcoiin2gen for reaching 3/4 of their soft cap midway

3

through the #ICO. Less than 30 days til the close. Don't miss out." The next day, Seagal's Facebook account posted the same tout.

d.  On March 6, 2018 Seagal's Twitter account posted: "Friends, I wanted to announce that @Bitcoiin2Gen will soon be listed on some of the biggest exchanges globally. Stay tuned for more information coming very shortly."

11.  The Company paid Seagal approximately $157,000 for these promotions, pursuant to the Endorsement Agreement. Seagal did not, however, disclose in his posts any information about the fact or amount of compensation he received, or was to receive, from B2G for making the promotions.

12.  Seagal's promotion of the B2G ICO occurred more than six months after the Commission issued the DAO Report of Investigation indicating that virtual tokens or coins sold in ICOs may be securities, and thus, subject to the federal securities laws.[2]

13.  Seagal's promotion of the B2G ICO occurred nearly four months after the Commission's Division of Enforcement and Office of Compliance Inspections and Examinations issued a public statement reminding market participants that any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion, and that a failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws.[3]

**Seagal Violated Section 17(b) of the Securities Act**

14.  Section 17(b) of the Securities Act makes it unlawful for any person to:

publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

---

[2]  Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Rel. No. 81207 (July 25, 2017).

[3]  See Statement of SEC Division of Enforcement and Office of Compliance Inspections and Examinations Urging Caution Around Celebrity Backed ICOs, available at https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos (Nov. 1, 2017).

Seagal violated Section 17(b) of the Securities Act by touting the B2G ICO—which involved the offer and sale of securities—on his social media accounts without disclosing that he received compensation from the issuer for doing so, or the amount of the consideration.

## Undertakings

15.    Respondent has undertaken to:

a. for a period of three (3) years from the date of this Order, forgo receiving or agreeing to receive any form of compensation or consideration, directly or indirectly, from any issuer, underwriter, or dealer, for directly or indirectly publishing, giving publicity to, or circulating any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security, digital or otherwise, for sale, describes such security.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that:

A.    Pursuant to Section 8A of the Securities Act, Respondent cease and desist from committing or causing any violations and any future violations of Section 17(b) of the Securities Act.

B.    Respondent shall pay disgorgement of $157,000, prejudgment interest of $16,448.76, and a civil money penalty in the amount of $157,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3), pursuant to the schedule set forth in Section C, below.  If timely payment of disgorgement is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600 and if timely payment of a civil money penalty is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

C.    Payment shall be made in the following installments:

1.    Within thirty (10) days of the entry of this Order, Respondent will pay $75,000.

2.    Within ninety (90) days of the entry of this Order, Respondent will pay $50,000.

3.    Within one hundred and eighty (180) days of the entry of this Order, Respondent will pay $50,000.

5

4.  Within two hundred and forty (240) days of the entry of this Order, Respondent will pay $50,000.

5.  Within three hundred and thirty (330) days of the entry of this Order, Respondent will pay the remainder due under Section B.

D.    Payment must be made in one of the following ways:

(1)    Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Steven Seagal as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Kristina Littman, U.S. Securities and Exchange Commission, Division of Enforcement, 100 F Street., NE, Washington DC, 20549.

E.    Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, he shall not argue that he is entitled to, nor shall he benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that he shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more

6

investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

F.      Respondent shall comply with the undertakings enumerated in Section III, paragraph 15.a.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S. C. § 523, the findings in this Order are true and admitted by Respondent, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

By the Commission.

Vanessa Countryman
Secretary

7

Exhibit 2

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

**ADMINISTRATIVE PROCEEDING**
File No.

|  |  |  |
|---|---|---|
| **In the Matter of** | : | |
| | : | |
| **Steven Seagal** | : | |
| | : | **OFFER OF SETTLEMENT** |
| | : | **OF STEVEN SEAGAL** |
| **Respondent.** | : | |
| | : | |

**I.**

Steven Seagal ("Seagal" or "Respondent"), pursuant to Rule 240(a) of the Rules of Practice of the Securities and Exchange Commission ("Commission") [17 C.F.R. § 201.240(a)], submits this Offer of Settlement ("Offer") in anticipation of cease-and-desist proceedings to be instituted against it by the Commission, pursuant to Section 8A of the Securities Act of 1933 ("Securities Act").

**II.**

This Offer is submitted solely for the purpose of settling these proceedings, with the express understanding that it will not be used in any way in these or any other proceedings, unless the Offer is accepted by the Commission. If the Offer is not accepted by the Commission, the Offer is withdrawn without prejudice to Respondent and shall not become a part of the record in these or any other proceedings, except that rejection of the Offer does not affect the continued validity of the waivers pursuant to Rule 240(c)(5) of the Commission's Rules of Practice [17 C.F.R. § 201.240(c)(5)] with respect to any discussions concerning the rejection of the Offer.

**III.**

On the basis of the foregoing, the Respondent hereby:

A. Admits the jurisdiction of the Commission over him and over the matters set forth in the Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-and Desist Order ("Order");

B. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or in which the Commission is a party, and without admitting or denying the findings contained in the Order, except as to the Commission's jurisdiction

over him and the subject matter of these proceedings, which are admitted, consents to the entry of an Order by the Commission containing the following findings[1] set forth below:

## Summary

From approximately February 12, 2018 through March 6, 2018 (the "Relevant Period"), Seagal—a well-known Hollywood actor and producer—touted on social media a security that was being offered and sold in an initial coin offering ("ICO") without disclosing that the issuer was paying him for the promotions. Seagal's failure to disclose this compensation violated Section 17(b) of the Securities Act, which makes it unlawful for any person to promote a security without fully disclosing the receipt and amount of such consideration.

## Respondent

1.       **Seagal,** age 67, is a U.S. national who is currently residing in Moscow, Russia.

## Background

2.       During the Relevant Period, Seagal had approximately 107,000 Twitter followers and 6.7 million Facebook followers.

3.       During that same period, Seagal promoted on his Twitter and Facebook accounts a security being sold through an ICO, allowed his likeness to be used on the ICO issuer's official website and marketing materials, and participated in a webinar with potential investors in the ICO in exchange for payments from the ICO issuer.

4.       Specifically, Seagal promoted a securities offering conducted through an ICO by Bitcoiin2Gen ("B2G" or "the Company"), an international online company, from approximately February 12, 2018 through March 26, 2018, in which it offered and sold digital tokens ("B2G tokens") to be issued on the Ethereum blockchain. B2G offered and sold tokens that were investment contracts and therefore securities pursuant to Section 2(a)(1) of the Securities Act. B2G described B2G tokens as "the next generation of Bitcoin." According to B2G's marketing materials, the Company was conducting an ICO to raise capital to build an "ecosystem" that would allow users to trade B2G tokens, provide wallet staking, and trade altcoins and fiat currencies, all "on a secure, comprehensive platform." Participants in the ICO invested Bitcoin, U.S. Dollars, Euros, or made payments via credit card in exchange for B2G tokens.

5.       Based on B2G's marketing materials, as well as statements by B2G affiliates, B2G token purchasers had a reasonable expectation of profits from their investment in the B2G enterprise. The proceeds of the B2G token offering were intended to be used by B2G to build an "ecosystem" that would create demand for B2G tokens and consequently make them more valuable. Purchasers of B2G tokens would reasonably have had the expectation that B2G and its agents would expend significant efforts to develop this ecosystem that would increase the value of

---

[1]       The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

their B2G tokens, resulting in investor profit. B2G's marketing materials, moreover, contained numerous direct statements that the B2G tokens would rise in value as a result of the efforts of B2G and its agents, and that, at a minimum, investors would receive a guaranteed return each month.

6.      In addition, B2G's marketing materials highlighted that the Company and its agents would ensure a secondary trading market for B2G tokens after the ICO, noting the ability for investors to liquidate and trade B2G tokens on digital-asset platforms following the token sale, including its own secondary trading platform. B2G's marketing materials also emphasized the purported expertise of B2G's management.

7.      Pursuant to a contract between Seagal and the entity controlling B2G ("the Endorsement Agreement"), Seagal was promised $250,000 in cash and $750,000 worth of B2G tokens in exchange for his promotion of B2G.

8.      Consistent with the Endorsement Agreement, on February 12, 2018, B2G announced, via a press release, that Seagal would endorse its ICO. The press release quoted Seagal as saying: "I endorse this opportunity wholeheartedly . . . I am excited about the management, and especially about the secure blockchain, underlying mining technology, and safeguards." Seagal's quote in the press release did not disclose that he was being paid for the promotion.

9.      Shortly thereafter, Seagal began promoting B2G's ICO on social media by posting or authorizing his agents to post at least nine touts, including, among others, the following:

a.      On February 19, 2018, Seagal's Facebook account posted a link to the press release on B2G's newsroom page titled "Zen Master Steven Seagal Has Become the Brand Ambassador of Bitcoiin2Gen." The post contained the caption: "From Team Seagal . . . Steven has just become the worldwide ambassador for the Bitcoiin 2nd Generation crypto currency." The post also contained a link to participate in the ICO and a promotional code.

b.      On February 20, 2018, Seagal's Twitter account posted a link to the same press release that promoted the ICO and included his endorsement. This post was "pinned" to Seagal's Twitter account, thus displaying before all of Seagal's other posts on his Twitter page.

c.      On February 28, 2018, Seagal's Twitter account posted a picture of Seagal with the caption: "Congratulations @bitcoiin2gen for reaching 3/4 of their soft cap midway through the #ICO. Less than 30 days til the close. Don't miss out." The next day, Seagal's Facebook account posted the same tout.

d.      On March 6, 2018 Seagal's Twitter account posted: "Friends, I wanted to announce that @Bitcoiin2Gen will soon be listed on some of the biggest exchanges globally. Stay tuned for more information coming very shortly."

10.    The Company paid Seagal approximately $157,000 for these promotions, pursuant to the Endorsement Agreement.  Seagal did not, however, disclose in his posts any information about the fact or amount of compensation he received, or was to receive, from B2G for making the promotions.

11.    Seagal's promotion of the B2G ICO occurred more than six months after the Commission issued the DAO Report of Investigation indicating that virtual tokens or coins sold in ICOs may be securities, and thus, subject to the federal securities laws.[2]

12.    Seagal's promotion of the B2G ICO occurred nearly four months after the Commission's Division of Enforcement and Office of Compliance Inspections and Examinations issued a public statement reminding market participants that any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion, and that a failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws.[3]

13.    As a result of the conduct described above, Seagal violated Section 17(b) of the Securities Act, makes it unlawful for any person to:

> publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

Seagal violated Section 17(b) of the Securities Act by touting the B2G ICO—which involved the offer and sale of securities—on his social media accounts without disclosing that he received compensation from the issuer for doing so, or the amount of the consideration.

## Undertakings

Respondent undertakes to:

> a.    for a period of three (3) years from the date of this Order, forgo receiving or agreeing to receive any form of compensation or consideration, directly or indirectly, from any issuer, underwriter, or dealer, for directly or indirectly publishing, giving publicity to, or circulating any notice, circular, advertisement, newspaper, article, letter, investment service, or

---

[2]    Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Rel. No. 81207 (July 25, 2017).

[3]    See Statement of SEC Division of Enforcement and Office of Compliance Inspections and Examinations Urging Caution Around Celebrity Backed ICOs, available at https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos (Nov. 1, 2017).

communication which, though not purporting to offer a security, digital or
otherwise, for sale, describes such security.

## IV.

On the basis of the foregoing, Respondent hereby consents to the entry of an Order by the
Commission that:

A. Pursuant to Section 8A of the Securities Act, Respondent Seagal cease and desist from
committing or causing any violations and any future violations of Section 17(b) of the
Securities Act.

B. Respondent shall comply with the undertakings enumerated in Section (A) above.

C. Respondent shall pay disgorgement of $157,000, prejudgment interest of $16,448.76, and
civil penalties of $157,000 to the Securities and Exchange Commission.  Payment shall be
made in the following installments:

1.   Within thirty (10) days of the entry of this Order, Respondent will pay $75,000.

2.   Within ninety (90) days of the entry of this Order, Respondent will pay $50,000.

3.   Within one hundred and eighty (180) days of the entry of this Order, Respondent
will pay $50,000.

4.   Within two hundred and forty (240) days of the entry of this Order, Respondent
will pay $50,000.

5.   Within three hundred and thirty (330) days of the entry of this Order, Respondent
will pay the remaining principal and interest due.

Payments shall be applied first to post order interest, which accrues pursuant to SEC Rule
of Practice 600 and pursuant to 31 U.S.C. § 3717.  Prior to making the final payment set forth
herein, Respondent shall contact the staff of the Commission for the amount due.  If Respondent
fails to make any payment by the date agreed and/or in the amount agreed according to the
schedule set forth above, all outstanding payments under this Order, including post-order
interest, minus any payments made, shall become due and payable immediately at the discretion
of the staff of the Commission without further application to the Commission.

Payment must be made in one of the following ways:

(1)      Respondent may transmit payment electronically to the Commission,
which will provide detailed ACH transfer/Fedwire instructions upon
request;

      (2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

      (3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Steven Seagal as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Kristina Littman, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

J.     Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, he shall not argue that he is entitled to, nor shall he benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that he shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

By submitting this Offer, Respondent hereby waives, subject to the acceptance of the offer, the rights specified in Rule 240(c)(4) [17 C.F.R. § 201.240(c)(4)] of the Commission's Rules of Practice. Specifically, Respondent waives:

(1) All hearings pursuant to the statutory provisions under which the proceeding is to be or has been instituted;
(2) The filing of proposed findings of fact and conclusions of law;
(3) Proceedings before, and an initial decision by, a hearing officer;
(4) All post-hearing procedures; and
(5) Judicial Review by any court.

In addition, by submitting this offer, Respondent waives the rights specified in Rule 240(c)(5) [17 C.F.R. § 201.240(c)(5)] of the Commission's Rules of Practice. Specifically, Respondent waives:

    (1) Any and all provisions of the Commission's Rules of Practice or other requirements of law that may be construed to prevent or disqualify any member of the Commission's staff from participating in the preparation of, or advising the Commission as to, any order, opinion, finding of fact, or conclusion of law that may be entered pursuant to this Offer; and

    (2) Any right to claim bias or prejudgment by the Commission based on the consideration of or discussions concerning settlement of all or any part of this proceeding.

Respondent also hereby waives service of the Order.

VI.

Respondent understands and agrees to comply with the terms of 17 C.F.R § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies the allegations." As part of Respondent's agreement to comply with the terms of Section 202.5(e), Respondent: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any finding in the Order or creating the impression that the Order is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Respondent does not admit the findings of the Order, or that the Offer contains no admission of the findings, without also stating that the Respondent does not deny the findings; and (iii) upon the filing of this Offer of Settlement, Respondent hereby withdraws any papers previously filed in this proceeding to the extent that they deny, directly or indirectly, any finding in the Order. If Respondent breaches this agreement, the Division of Enforcement may petition the Commission to vacate the Order and restore this proceeding to its active docket. Nothing in this provision affects Respondent's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

VII.

Consistent with the provisions of 17 C.F.R. § 202.5(f), Respondent waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.

VIII.

Respondent hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek

from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Respondent to defend against this action. For these purposes, Respondent agrees that Respondent is not the prevailing party in this action since the parties have reached a good faith settlement.

## IX.

Respondent agrees that he shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source including, but not limited to, payment made pursuant to any insurance policy, with regard to any penalty amounts that Respondent shall pay pursuant to this Order, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Respondent further agrees that he shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state or local tax for any penalty amounts that Respondent shall pay pursuant to this Order, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

## X.

Respondent stipulates, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, that the findings in the Order are true and admitted by Respondent, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent under the Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

## XI.

Respondent states that he has read and understands the foregoing Offer, that this Offer is made voluntarily, and that no promises, offers, threats, or inducements of any kind or nature whatsoever have been made by the Commission or any member, officer, employee, agent, or representative of the Commission in consideration of this Offer or otherwise to induce it to submit to this Offer.

_____ Day of _____

_____
Steven Seagal

**STATE OF** _____     }
                                         }    **SS:**
**COUNTY OF** _____            }

The foregoing instrument was acknowledged before me this __day of _____, 20__, by Steven Seagal, who ___is personally known to me or ___who has produced _____ as identification and who did take an oath.

_____
Notary Public
State of _____
Commission Number        :
Commission Expiration    :

Exhibit 3

REAL ESTATE

# Steven Seagal is selling his bulletproof Arizona mansion for $3.4M

By Mary K. Jacob                                                    April 23, 2021 | 6:46pm | Updated



Steven Seagal is selling his bulletproof Arizona mansion for $3.4 million.
Realtor.com

It's exactly what you'd expect the home of a seventh-degree aikido black belt actor who's starred in a series of action-packed films would look like.

Steven Seagal, who rose to fame playing badass characters in the late '80s and '90s, has listed his secluded bulletproof Arizona home for $3.4 million.

Located in Scottsdale, the estate is situated on nearly 12 acres of desert land as far as the eye can see.

And the decor of the home is just as mysterious as the 6-foot-4 Seagal, now 69, is.

Built into a picturesque hillside overlooking the Phoenix metro area, the sprawling five-bedroom, six-bath property resides 3,000 feet above sea level — in case the desert mysteriously gets a flood of rain, of course.

Steven Seagal is selling his bulletproof Arizona mansion for $3.4M



The property spans 8,973 square feet.
Via Realtor

Case 1:21-mc-01797-WFK   Document 1-2   Filed 06/15/21   Page 22 of 44 PageID #: 31



**The hot tub.**
Via Realtor

Case 1:21-mc-01797-WFK   Document 1-2   Filed 06/15/21   Page 23 of 44 PageID #: 32



The infinity pool.
Via Realtor

Steven Seagal is selling his bulletproof Arizona mansion for $3.4M



The expansive terrace features two samurai statues.
Via Realtor

Steven Seagal is selling his bulletproof Arizona mansion for $3.4M



**The home is decorated with cacti and desert plants.**
Via Realtor

Steven Seagal is selling his bulletproof Arizona mansion for $3.4M



The master bathroom with a marble tub and a fire installation.
Via Realtor

The architectural design of the home's exterior is built like a maze with bulletproof floor-to-ceiling glass windows and multidirectional scenes of the cacti-filled desert.

Exterior features include natural stone pillars, natural copper accents and samurai sculptures. The home also boasts a jacuzzi and an infinity pool.



**The custom-made movie theater.**
Via Realtor

Case 1:21-mc-01797-WFK   Document 1-2   Filed 06/15/21   Page 28 of 44 PageID #: 37



The home is made up of five bedrooms and six bathrooms.
Realtor.com



One of five bedrooms.
Via Realtor

Case 1:21-mc-01797-WFK   Document 1-2   Filed 06/15/21   Page 30 of 44 PageID #: 39



The property boasts floor-to-ceiling bulletproof windows with desert views.
Realtor.com

Four of the bedrooms are located in the home, along with a theatre and several flex rooms. The other bedroom is located in a separate guesthouse.

Known for his roles in "Under Siege," "Hard to Kill," "Above the Law" and "Driven to Kill," Seagal first purchased the home in 2010, but has been trying to sell it since 2012. He initially listed the home for $4.25 million and it has been on-and-off the market since, property records show.



**The BBQ area.**
Via Realtor

Steven Seagal is selling his bulletproof Arizona mansion for $3.4M



The kitchen is made with marble countertops.
Via Realtor

Steven Seagal is selling his bulletproof Arizona mansion for $3.4M



An expansive living space.
Realtor.com



The breakfast space.
Realtor.com

Seagal also owns a dude ranch in Colorado and homes in the Mandeville Canyon section of Los Angeles and Louisiana. In 2018, he also reportedly purchased a home in Russia.

He previously had trouble selling his Tennessee estate in 2017, which he eventually sold at a loss.

Over the years, Seagal has found himself embroiled in sexual assault and harassment allegations made against him from 1995 to 2018. He has denied any wrongdoing.

FILED UNDER   **ARIZONA, CELEBRITY REAL ESTATE, REAL ESTATE, RESIDENTIAL REAL ESTATE, STEVEN SEAGAL, 4/23/21**



**RECOMMENDED** 1/5

Case 1:21-mc-01797-WFK   Document 1-2   Filed 06/15/21   Page 35 of 44 PageID #: 44

Tennis star Caroline Wozniacki slams $18.7M on
Fisher Island penthouse

Read More >

Exhibit 4



OTP Business Management Inc.

Home
Our Team
Contact

| | | |
|---|---|---|
| Principal- Alan L.Tivoli | 310-300-2939 | ativoli@otpmgt.com |
| Managing Bookkeeper- Renee Davis | 310-300-2940 | rdavis@otpmgt.com |
| Chief Accountant- Gina Jacobson | 310-300-2933 | gjacobson@otpmgt.com |
| Bookkeepers: Mike Cabrera | 310-300-2935 | mcabrera@otpmgt.com |
| Sheila Montgomery | 310-300-2934 | smontgomery@otpmgt.com |
| Lisa Ross | 310-300-2931 | lross@otpmgt.com |
| Matt Ramos | 310-300-2936 | mramos@otpmgt.com |

▲

Exhibit 5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JUN 1 5 2021   ★

LONG ISLAND OFFICE

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

STEVEN SEAGAL,

Defendant.

21-mc-_____

**[PROPOSED] ORDER TO SHOW CAUSE ON APPLICATION
TO CONVERT A COMMISSION ORDER TO A JUDGMENT**

Upon the Application of the United States Securities and Exchange Commission

(the "Commission") for a judgment pursuant to Section 20(c) of the Securities Act of 1933

("Securities Act"), 15 U.S.C. § 77t(c), so that the Commission may enforce its order entered

February 27, 2020 directing Steven Seagal ("Seagal") to pay disgorgement of $157,000,

prejudgment interest of $16,448.76, and a civil money penalty in the amount of $157,000 to the

Commission, upon the Declaration of Maureen Peyton King, and it appearing that an Order to

Show Cause on Application to Enter Judgment should issue, it is hereby:

ORDERED, that Defendant shall appear at a hearing to be held before the Hon.

_____, United States District Judge, at the United States District

Courthouse, 225 Cadman Plaza East, Brooklyn, New York, Courtroom _____, at

_____ on _____, 2021, to show cause why the Commission's

Application should not be granted.

FURTHER ORDERED, that if Seagal fails to file answering papers and/or appear, the Court may find such party in default and enter an appropriate order against such party at such time without further notice being given.

FURTHER ORDERED, that the Commission shall serve a copy of this Order to Show Cause, the Commission's Application and supporting papers, and any other papers required by the rules of this Court, on Alan Tivoli as agent for Steven Seagal by 5:00 p.m. on _____, 2021. Service shall be made pursuant to Rule 4 of the Federal Rules of Civil Procedure.

FURTHER ORDERED, that Seagal shall serve and file any opposing papers by 5:00 p.m. on _____, 2019. Service shall be made by e-mail at kingmp@sec.gov.

FURTHER ORDERED, that if Seagal files any opposing papers, the Commission may file any reply papers by 5:00 p.m. on _____, 2021. The Commission shall serve any reply papers on Mr. Tivoli by mailing the papers on or before that date using an overnight delivery service or, if Mr. Tivoli consents in writing, by email.

**SO ORDERED.**

Dated:       New York, New York

                _____, 2021

                                        _____

                                        UNITED STATES DISTRICT JUDGE

Exhibit 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JUN 1 5 2021   ★

LONG ISLAND OFFICE

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,    21-mc-_____

v.

STEVEN SEAGAL,

Defendant.

**[PROPOSED] JUDGMENT CONVERTING THE
COMMISSION'S ORDER TO A JUDGMENT**

Plaintiff Securities and Exchange Commission (the "Commission") having applied to this Court pursuant to Section 20(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(c), to convert to a Judgment a Commission Order dated February 27, 2020, which among other things, directed Steven Seagal ("Seagal") to disgorge $157,000, plus prejudgment interest of $16,448.76, such prejudgment interest continuing to accrue on funds owed until they are paid, and to pay a civil money penalty in the amount of $157,000 to the Commission, and it appearing that such application should be granted,

**IT IS HEREBY ORDERED, THAT:**

1.       The Commission's application is GRANTED.

2.       Pursuant to Section 20(c) of the Securities Act, 15 U.S.C. § 77t(c), Seagal shall comply with the Commission Order by paying to the Commission the outstanding balance on the Judgment and applicable interest pursuant to SEC Rule of Practice 600 and 31 U.S.C. § 3717 within 30 days.

3.       Payment may be made electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request made to Disgorgement -

Penalty@sec.gov.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at https://www.sec.gov/paymentoptions.   Seagal may also pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and setting forth the title and civil action number of this action and the name of this Court; and specifying that payment is made pursuant to this Judgment.  The funds may be hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

Payments must be accompanied by a cover letter identifying Seagal as the Defendant in this action, and the name of this Court and the docket number of this action.  A copy of the cover letter and payment confirmation must be sent to Maureen Peyton King, Securities and Exchange Commission, New York Regional Office, 200 Vesey Street, Suite 400, New York, NY 10281.

4.      By making such payment Seagal relinquishes all legal and equitable right, title and interest in such funds, and no portion of such funds shall be returned to Seagal.  The Commission shall send funds received to the United States Treasury.

5.      Seagal shall pay to the Commission post-judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

6.      If Seagal does not pay the above amounts the Commission may enforce this Judgment through the remedies available by law to collect the unpaid balance.

7.      To preserve the deterrent effect of the civil penalty, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes.

8.      The Court shall retain jurisdiction of this matter for the purposes of enforcing the

2

terms of this Judgment.

9.    The Court may order such relief as may be necessary for enforcement of any order of this Court as to disgorgement and prejudgment interest through civil contempt and/or other collection procedures authorized by law.


Dated: _____, 2021
          Brooklyn, New York


                                        _____
                                        **UNITED STATES DISTRICT JUDGE**

3